STATE OF NORTH CAROLINA, PLAINTIFF v. SAMUEL L. LOFTON, DEFENDANT

No. COA07-1530

(Filed 21 October 2008)

## 1. Evidence— prior crimes or bad acts—assault—motive—similarities—remoteness

The trial court did not commit plain error in a felony aggravated assault on a handicapped person, felonious assault by strangulation, false imprisonment, and habitual felon case by permitting the victim to testify about prior incidents of defendant assaulting her because: (1) the evidence was admissible to show motive since defendant disputed committing any crimes against the victim; (2) the testimony regarding defendant's previous motive to hit the victim was relevant since it made it more probable that defendant committed the charged crimes against the victim when he again accused her of cheating on him; (3) similarities existed between the offenses when all three incidents involved defendant accusing the victim of cheating on him before striking her, one of the prior incidents and the current incident involved the use of a weapon, and the prior incidents and the current crime involved defendant violently hitting the victim on the head or face; (4) the victim testified that the prior incidents occurred less than a year before the incidents for which defendant was charged; and (5) any prejudicial effect of the evidence was outweighed by their probative value in establishing defendant's motive in assaulting the victim.

## 2. Evidence— victim's mental condition—victim impact evidence

The trial court did not commit plain error in a felony aggravated assault on a handicapped person case by permitting the victim to testify regarding her mental condition, including her

dreams, after the alleged incident because: (1) the victim's testimony regarding her mental condition was not victim impact evidence; and (2) "serious injury" under N.C.G.S. § 14-32 for the charge of assault on a handicapped person includes serious mental injury caused by an assault with a deadly weapon, and the victim's testimony regarding her mental state supported an element of that crime.

Appeal by defendant from judgments entered on or about 18 July 2007 by Judge William C. Gore, Jr. in Superior Court, Cumberland County. Heard in the Court of Appeals 19 August 2008.

*Attorney General Roy A. Cooper, III, by Assistant Attorney General LaToya B. Powell, for the State.*

*Leslie C. Rawls, for defendant-appellant.*

STROUD, Judge.

Defendant was convicted by a jury of felony aggravated assault on a handicapped person, felonious assault by strangulation, false imprisonment, and was found to have attained habitual felon status. Defendant appeals, claiming the trial court committed plain error when: (1) it allowed the victim to testify to previous incidents with defendant which were "inadmissible under the North Carolina Rules of Evidence as more prejudicial than probative and as improper evidence of prior bad acts[,]" and (2) it admitted evidence of the victim's mental condition which "had no probative value, but was highly inflammatory and likely to arouse the jury's sympathies." For the following reasons, we find that the trial court did not commit error.

## I. Background

The State's evidence tended to show: In approximately 1996, Vivian Downs ("Ms. Downs"), the victim, suffered a stroke which paralyzed the entire right side of her body. As a result of the stroke, Ms. Downs cannot move her right arm and can only slightly move her leg. Ms. Downs can walk with assistance. Ms. Downs also suffers from arthritis.

Ms. Downs met defendant in 2001. Ms. Downs and defendant dated briefly. In May of 2001, Ms. Downs moved in with defendant. In 2005, defendant began hitting Ms. Downs after accusing her of sleeping with defendant's brother-in-law, while they were visiting him in Raleigh. Approximately a month after this incident, defendant struck

Ms. Downs in the face. In early October 2005, defendant accused Ms. Downs of cheating on him with two lesbians and hit her in the face causing her to fall onto the floor; defendant then threw a sharp knife at Ms. Downs, which missed her and went underneath the sofa. Ms. Downs tried to hide her resulting bruises from family and friends.

On the evening of 10 October 2005, around 10:30 p.m., Ms. Downs was watching television in the master bedroom while defendant was watching television in another bedroom. Defendant hurried out of the bedroom and opened the front door. Ms. Downs had not heard anyone knock or ring the doorbell. Defendant then came back to the master bedroom and asked Ms. Downs, "Where is he at? Where is that M.F.?" and struck her, causing her to fall across the bed. Ms. Downs asked defendant what was wrong with him. Defendant then told Ms. Downs, "You better tell me who it is. . . . When I come back, I'm going to kill you." Ms. Downs then heard defendant go into the kitchen and open the utensil drawer where he retrieved a knife and hammer.

Ms. Downs tried to get away, but defendant grabbed her by the hair, pulled her, and kicked her to the hardwood floor. Ms. Downs' knees were bruised and her head was bleeding. Ms. Downs asked defendant to take her to the hospital and he told her, "Die, bitch." Defendant then began to tear up the room, breaking things, and took the mattress off the bed, while Ms. Downs remained on the floor. Defendant continued to hit Ms. Downs in the head and stomach so hard that at one point she thought she had been knocked unconscious.

Ms. Downs remained on the floor for at least an hour. Ms. Downs once again tried to escape, but defendant caught her at the front door and dragged her back to the bedroom, while continuing to kick her. Defendant eventually put the mattress back on the bed, and Ms. Downs got off the floor. Defendant then punched Ms. Downs' breasts, grabbed her by the throat, put her in the closet, and started choking her. After choking her, defendant continued punching Ms. Downs in her breasts, causing them to turn red and blue.

Around 6:30 a.m., Ms. Downs made an attempt to contact her daughter on the telephone for help, telling defendant that she needed to cancel the van service for disabled people she rides to work because it was Columbus Day. However, Ms. Downs' daughter did not understand what Ms. Downs was saying as Ms. Downs was attempting to talk in codes because defendant was watching her. Later, Ms. Downs' sister, Arleen Best ("Mrs. Best"), called to tell Ms. Downs

that her father was in the hospital. Mrs. Best's husband, Richard Best ("Mr. Best"), came over to get Ms. Downs to take her to see her father and observed the house in disarray and bruises on Ms. Down's neck.

Around 12:30 p.m., Ms. Downs left with Mr. Best, and she confessed to him that defendant had beaten her. Mr. Best took Ms. Downs to Cape Fear Valley Medical Center, and her medical examination documented two lesions on her scalp, a hematoma on her breast, and several bruises on various parts of her body. As a result of this incident, Ms. Downs was put on medication for anxiety to help her rest because she was having visions about defendant coming at her with a knife.

Ms. Downs was interviewed at the emergency room on 10 October 2005 around 3:00 p.m. by Officer Kenneth Timms ("Officer Timms") of the Fayetteville Police Department. Ms. Downs told Officer Timms defendant had assaulted her and the details surrounding the assault. Defendant was taken into custody. While being processed, defendant, without being questioned, told Officer Timms "the reason he hit [Ms. Downs] was because he thought she was cheating on him and there was a man in the house."

On or about 25 September 2006, the Cumberland County Grand Jury indicted defendant for felonious assault on a handicapped person ("assault on a handicapped person"), felonious assault by strangulation ("assault by strangulation"), false imprisonment, and communicating threats. This same day a special indictment was issued indicting defendant with habitual felon status.

Trial began, and at the close of the State's evidence the trial court dismissed the charge of communicating threats due to a lack of evidence. On or about 18 July 2007, the jury found defendant guilty of assault on a handicapped person, assault by strangulation, and false imprisonment. Defendant was also found to have attained habitual felon status. Judge William C. Gore Jr. sentenced defendant to 73-97 months on the assault on a handicapped person conviction and a consecutive term of 73-97 months on the combined counts of assault by strangulation and false imprisonment. Defendant appeals, claiming the trial court committed plain error when: (1) it allowed the victim to testify to previous incidents with defendant which were "inadmissible under the North Carolina Rules of Evidence as more prejudicial than probative and as improper evidence of prior bad acts[,]" and (2) it allowed in evidence of the victim's mental condition which "had no probative value, but was highly inflammatory and likely to arouse the

jury's sympathies." For the following reasons, we find that the trial court did not commit plain error.

## II. Standard of Review

Defendant concedes that he did not object at trial to Ms. Downs' testimony. Plain error analysis is the applicable standard of review when a criminal defendant has not objected to the admission of evidence at trial. *State v. Ridgeway,* 137 N.C. App. 144, 147, 526 S.E.2d 682, 685 (2000).

> The plain error rule is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done, or where the error is grave error which amounts to a denial of a fundamental right of the accused, or the error has resulted in a miscarriage of justice or in the denial to appellant of a fair trial or where the error is such as to seriously affect the fairness, integrity or public reputation of judicial proceedings or where it can be fairly said the instructional mistake had a probable impact on the jury's finding that the defendant was guilty.

*State v. Odom,* 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (citations, quotation marks, ellipses, and brackets omitted). "Therefore, if after thoroughly examining the record, we are not persuaded that the jury probably would have reached a different result had the alleged error not occurred, we will not award defendant a new trial." *Ridgeway* at 147, 526 S.E.2d at 685 (citation omitted).

## III. Evidence of Prior Bad Acts

[1] Defendant first contends that the trial court committed plain error by permitting Ms. Downs to testify about prior incidents of the defendant assaulting her. Specifically, defendant contends that the prior acts to which Ms. Downs testified are only relevant to show that defendant "had the propensity to commit an offense of the nature of the crimes charged in this case."

Ms. Downs testified about her relationship with the defendant:

A. From the start, it was pretty good. That last, I'd say, the latter part of—well, no, that whole year, 2005, things had changed. He had gotten really—he got—what can I say? He just got mean. He started hitting on me.

**STATE v. LOFTON**

[193 N.C. App. 364 (2008)]

Q. And what would prompt his abuse?

A. Different things. One time he hit me. He accused me of [sic] his brother-in-law but he didn't hit me until like two or three weeks later.

Q: What do you mean he accused you of—

A: We had went and spent the weekend with him in Raleigh, North Carolina, and then about two weeks later, he said that I went to bed with him. So I argued with him how am I going to be with another man and you're in the same house and his wife in the same house. I thought it was crazy. You got a problem. And so he hit me. At that point then I knew that—that was the first time he ever hit me so I felt like if he did it once, he do it again. Things just escalated, you know. He never said I'm sorry. He never apologized. He just said that I shouldn't have done that, you know, and things just escalated. I never knew what would set him off. He was always arguing, fussing about anything or nothing. And things aren't so—you know, I kept saying something was wrong but it's just hard to explain. I didn't really—

Q: Ms. Downs, when you said he hit you because he accused you of sleeping with his brother-in-law, when approximately was that?

A: I'm sorry?

Q: When was that?

A: I can't remember the month. I can't remember. I just know that after that, maybe a month later, he hit me again and it escalated.

Q: Where did he hit you?

A: In the face.

Ms. Downs continued to testify about another prior incident in which defendant struck her:

Q: Okay. Let me take your attention to the first part of October in 2005. What happened with regard to you and the defendant in the first part of that week?

A: Well, for the past—that—for those couple of weeks, he had been real mean and one day I came home from work and he had accused me of being with these two lesbians and he hit me.

Q: Where did he hit you?

A: In the face. And he knocked me—I fell on the floor, you know. He did that as soon as I got home from work. I just got in the door good. He started fussing with me. I said what's wrong with you, you know. And then at one point, I was in the kitchen and he was fussing at me about what—well, I can't remember. He used to fuss all the time and he said something and I retaliated and I said something back.

Q. What did he say? What did you say? ·

A. I can't remember. It's been so much. I can't remember. But he was fussing with me and sometimes I would say something. Sometimes I just couldn't stand it and I said, you know, I'm grown too. I don't have to put up with your abuse. I would say something. I would say something that would strike a nerve and he'd hit me. That particular day, he hit me in the face and I went towards the living room. (Witness crying.)

MS. ROTHSTEIN: Your Honor, if we could just have a moment.

THE COURT: Yes, ma'am.

THE WITNESS: And then he threw a knife at me. He threw a sharp knife at me and it missed me by that much. I said you could have hit me in my eye but it missed and went underneath the sofa, but again I didn't tell anybody.

A. Analysis

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. N.C. Gen. Stat. § 8C-1, Rule 401. "Evidence which is not relevant is not admissible[,]" and "[a]ll relevant evidence is admissible . . . ." N.C. Gen. Stat. § 8C-1, Rule 402. Even when relevant,

> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C. Gen. Stat. § 8C-1, Rule 404(b).

Thus, even though evidence may tend to show other crimes, wrongs, or acts by the defendant and his propensity to commit them, it is admissible under Rule 404(b) so long as it also is relevant for some purpose other than to show that defendant has the propensity for the type of conduct for which he is being tried.

*State v. Bagley*, 321 N.C. 201, 206-07, 362 S.E.2d 244, 247 (1987) (citation and quotation marks omitted), *cert. denied*, 485 U.S. 1036, 99 L. Ed. 2d 912 (1988).

Where evidence of prior conduct is relevant to an issue other than for determining the defendant's propensity to commit the charged offense, the ultimate test for determining whether such evidence is admissible is whether the incidents are sufficiently similar and not so remote in time as to be more probative than prejudicial under the balancing test of N.C.G.S. § 8C-1, Rule 403. . . . Finally, once a trial court has determined the evidence is admissible under Rule 404(b), the court must still decide whether there exists a danger that unfair prejudice substantially out-. weighs the probative value of the evidence.

*State v. Stevenson*, 169 N.C. App. 797, 800, 611 S.E.2d 206, 209 (2005) (citations and quotation marks omitted).

B. Relevancy

Our Supreme Court has determined that "testimony about [a] defendant's misconduct toward his wife was proper under Rule 404(b) to prove motive, opportunity, intent, preparation, absence of mistake or accident with regard to the subsequent . . . attack upon her." *State v. Scott*, 343 N.C. 313, 330, 471 S.E.2d 605, 615 (1996) (citation and quotation marks omitted). "Specifically, evidence of frequent quarrels, separations, reconciliations, and ill-treatment is admissible as bearing on intent, malice, motive, premeditation, and deliberation." *Id.* at 331, 471 S.E.2d at 616 (citation omitted). "The existence of a motive is, however, a circumstance tending to make it more probable that the person in question did the act, hence evidence of motive is always admissible where the doing of the act is in dispute." *State v. Coffey*, 326 N.C. 268, 280, 389 S.E.2d 48, 55 (1990) (citation and quotation marks omitted), *cert. denied*, 421 S.E.2d 360 (N.C. 1992).

Here, defendant pled not guilty to all charges. Furthermore, during the cross examination of Ms. Tina Powell ("Ms. Powell"), the daughter of Ms. Downs, defendant attempted to show that Ms. Downs

was the cause of her own injuries, rather than defendant, by extensively questioning Ms. Powell about various incidents when Ms. Downs had injured herself, including burning herself while cooking, falling out of bed, and slamming a door on her foot and falling. As defendant disputed committing any crimes against Ms. Downs, the evidence of motive is admissible. *See id.*

At trial, Ms. Downs testified that defendant had twice previously hit her because he believed she was cheating. This testimony regarding defendant's previous motive to hit Ms. Downs makes it more probable that defendant committed the charged crimes against Ms. Downs as once again defendant believed she was cheating on him, in accord with defendant's own words to Officer Timms. N.C. Gen. Stat. § 8C-1, Rule 401; *Coffey* at 280, 389 S.E.2d at 55. Therefore, we conclude that Ms. Downs' testimony regarding prior violent incidents was relevant. *See* N.C. Gen. Stat. § 8C-1, Rule 401.

C. Similarity and Remoteness

"The determination of similarity and remoteness is made on a case-by-case basis, and the required degree of similarity is that which results in the jury's 'reasonable inference' that the defendant committed both the prior and present acts." *Stevenson* at 800, 611 S.E.2d at 209. Our Supreme Court has stated that "[u]nder Rule 404(b) a prior act or crime is 'similar' if there are some unusual facts present in both crimes." *State v. Carpenter*, 361 N.C. 382, 388, 646 S.E.2d 105, 110 (2007) (citation, quotation marks, and ellipses omitted). Here notable similarities exist between the offenses for which defendant was convicted and the prior incidents about which Ms. Downs testified. First, all three incidents involved defendant accusing Ms. Downs of cheating on him before striking her. Second, one of the prior incidents and the current incident involved the use of a weapon. Third, the prior incidents and the crimes defendant was charged with involved him violently hitting Ms. Downs on the head or face. We conclude that these similarities allowed the jury to make a "reasonable inference" that defendant committed both the prior and present acts. *Stevenson* at 800, 611 S.E.2d at 210.

With regard to remoteness, we have determined that "[r]emoteness in time is less significant when the prior conduct is used to show intent, motive, knowledge, or lack of accident; remoteness in time generally affects only the weight to be given such evidence, not its admissibility." *Stevenson* at 801, 611 S.E.2d at 210 (citation and quotation marks omitted). Ms. Downs testified that the prior incidents

occurred in 2005, less than a year before the incidents for which defendant was charged. "One year is sufficiently close in time as to be relevant." *State v. Strickland*, 153 N.C. App. 581, 590, 570 S.E.2d 898, 904 (2002) (discussing defendant's prior attacks on the victim), *cert. denied*, 357 N.C. 65, 578 S.E.2d 594 (2003). Therefore, we conclude that these prior incidents were sufficiently similar and close in time to be admitted.

### D. Probative Value Versus Prejudicial Effect

"[R]elevant . . . evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C. Gen. Stat. § 8C-1, Rule 403. "Whether to exclude evidence under Rule 403 is a matter left to the sound discretion of the trial court." *State v. Stager*, 329 N.C. 278, 315, 406 S.E.2d 876, 897 (1991) (citation omitted). Furthermore, "[t]he party who asserts that evidence was improperly admitted usually has the burden to show the error and that he was prejudiced by its admission." *State v. Anthony*, 133 N.C. App. 573, 579, 516 S.E.2d 195, 199 (1999) (citation omitted), *aff'd*, 351 N.C. 611, 528 S.E.2d 321 (2000). Defendant has not shown that the trial court abused its discretion in admitting the evidence of defendant's prior assaults against Ms. Downs because any prejudicial effect of the evidence of defendant's prior assaults against Ms. Downs are outweighed by their probative value in establishing defendant's motive in assaulting Ms. Downs. We conclude that Ms. Downs' testimony regarding prior violent incidents by defendant was properly admitted, and this argument is overruled.

### IV. Evidence of the Victim's Mental Condition

[2] Defendant next contends that the trial court committed plain error by permitting Ms. Downs to testify regarding "her mental condition, including her dreams, after the alleged incident." Defendant asserted Ms. Downs' "testimony was inadmissible victim impact statements and therefore irrelevant" and quoted the following from the trial:

Q: And, Ms. Downs, what are your, if any, long-term injuries as a result of the attack by the defendant?

A. Well, at first, I said that I wasn't going to let Mr. Lofton ruin my life. I kept praying and I prayed and everybody was trying

to get me to go to counseling and I said, No, I don't need a counselor because I felt like I didn't do anything wrong. I don't have a problem. I don't go around hitting people and abusing people so why should I go. Everybody said I should go. I said, no, I'm just going to try to go on with my life. You know, but eventually it came back to haunt me. Because I got sick. The doctor put me on medication for anxiety to help me rest, but I'm going to have to go back because it's not working. I have dreams where I see visions where I see—you know, I'll see his hands—supposed to be him coming at me with a knife and then I'll jump up and then I can't breathe.

Victim impact evidence includes "[a] description of the nature and extent of any physical, psychological, or emotional injury suffered by the victim as a result of the offense committed by the defendant." N.C. Gen. Stat. § 15A-833(a)(1) (2005). "[V]ictim-impact evidence is generally inadmissible during the guilt/innocence phase of a trial." *State v. Davis*, 177 N.C. App. 98, 104, 627 S.E.2d 474, 478 (2006) (citation omitted). However, we do not regard Ms. Downs' testimony regarding her mental condition as victim impact evidence.

Defendant was charged with assault on a handicapped person. N.C. Gen. Stat. § 14-32.1 reads in pertinent part,

A person commits an aggravated assault or assault and battery upon a handicapped person if, in the course of the assault or assault and battery, that person:

(1) Uses a deadly weapon or other means of force likely to inflict serious injury or serious damage to a handicapped person; or

(2) Inflicts serious injury or serious damage to a handicapped person; or

(3) Intends to kill a handicapped person.

N.C. Gen. Stat. § 14-32.1(e) (2005). "[S]erious injury, within the meaning and intent of that term as used in N.C.G.S. § 14-32, includes serious mental injury caused by an assault with a deadly weapon." *State v. Everhardt*, 326 N.C. 777, 780, 392 S.E.2d 391, 393 (1990). Because "serious injury" may include serious mental injury, *see id.*, we deem Ms. Downs' testimony regarding her mental state to support an element of one of the crimes with which defendant was charged, and it is therefore relevant. *See* N.C. Gen. Stat. §§ 8C-1, Rule 401, 14-32.1. This argument is overruled.

V. Conclusion

For the foregoing reasons, we conclude that the trial court did not err in admitting evidence as to defendant's prior bad acts and Ms. Downs' mental condition. Therefore, we find no error.

NO ERROR.

Judges McGEE and McCULLOUGH concur.